UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

TAMMY HOKE,

     Plaintiff,

v.                                    Case No. 5:16cv140-WTH-CJK

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

     Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act"). The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401-34. Upon review of the record before the court, the undersigned concludes the findings of fact and determinations

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

of the Commissioner are supported by substantial evidence. The Decision of the Commissioner, therefore, should be affirmed and plaintiff's application for DIB denied.

## ISSUES ON REVIEW

Ms. Hoke, who will be referred to as claimant, plaintiff, or by name, raises three issues on appeal. She claims the ALJ erred in (1) failing to include certain limitations in the mental residual functional capacity ("RFC"), (2) failing to state the weight assigned to the opinion of treating physician Dr. Linda Lancaster, and (3) finding her not credible. Doc. 20, pp. 1-2.

## PROCEDURAL HISTORY

On February 21, 2013, Ms. Hoke filed an application for DIB, alleging disability beginning November 15, 2012, due to anxiety and schizophrenia. T. 123, 288-300, 319. The application was denied initially on May 2, 2013, T. 123-32, and on reconsideration on June 4, 2013, T. 179-87. Ms. Hoke requested a hearing, which was held on December 11, 2013. T. 40-81, 220. Shortly thereafter, the ALJ issued a decision denying benefits. T. 145-57. Ms. Hoke requested review by the Appeals Council, which vacated the ALJ's decision and remanded the matter for further proceedings. T. 162-64. Specifically, the Appeals Council noted a changed date last insured through September 30, 2013, which resulted in an unadjudicated period of time. T. 163. The Appeals Council also noted the ALJ did not define the term

"little interaction" in finding claimant limited in her ability to interact with co-workers. T. 163. The ALJ thus remanded the matter for further consideration of Ms. Hoke's RFC. T. 163.

A second hearing was held on July 16, 2014, following which the ALJ issued a decision denying Ms. Hoke's application. T. 15-28. Ms. Hoke sought review by the Appeals Council, which denied the request, making the ALJ's decision the final determination of the Commissioner. T. 1-11.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relevant to the issues raised in this appeal:

- "The claimant last met the insured status requirements of the Social Security Act on September 30, 2013." T. 17.

- "The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 15, 2012 through her date last insured of September 30, 2013 (20 CFR 404.1571 *et seq.*)." T. 18.

- "Through the date last insured, the claimant had the following severe impairments: schizophrenia; psychotic disorder; anxiety disorder; and migraines (20 CFR 404.1520(c))." T. 18.

- "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." T. 18.

- "[T]he claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She is limited to understanding, remembering, and carrying out simple instructions as well as performing simple repetitive tasks due to concentration and memory deficits. She can have no more than occasional contact with coworkers. She should avoid contact or interaction with the public. She should be in a low stress environment defined as few changes in the work environment and limited complex judgment making." T. 20.

- "Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565)." T. 26.

- "Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a))." T. 27.

- "The claimant was not under a disability, as defined in the Social Security Act, at any time from November 15, 2012, the alleged onset date, through September 30, 2013, the date last insured (20 CFR 404.1520(g))." T. 28.

## STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also*

*Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[2]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, she is not disabled.

2.    If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.    If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent her from performing her past relevant work, she is not disabled.[3]

5.    Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national

---

[3] Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

economy that accommodates the claimant's residual functional capacity and vocational factors, she is not disabled.

Step five (or step four in cases in which the ALJ decides a claimant can perform past work) is generally where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence; and (2) the claimant's subjective complaints. Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[4] "[R]esidual functional capacity is the most [a claimant] can still do despite [claimant's] limitations.[5] 20

---

[4] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20. C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[5] In addition to this rather terse definition of residual function capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 416.912(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 416.912(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 416.913.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends or other persons. (See paragraph (e) of this section and § 416.929.)[.]

C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by the disappointed claimant.

FACT BACKGROUND AND MEDICAL HISTORY[6]

Ms. Hoke was born on September 15, 1973.  T. 123.  She completed one year of college, received an honorable discharge from military service (U.S. Army 1992-1996, 1997-2002; National Guard 2005-2006), and previously worked as an eligibility worker, liaison, medic, and supply specialist.  T. 324, 513.  Ms. Hoke's claim is based on mental impairments, for which she sought treatment at Life Management Center of Northwest Florida ("Life Management") from October 3, 2012, through March 1, 2013.  T. 551-70.

During her initial visit, Ms. Hoke saw psychiatrist Omar Howard, M.D., for anxiety, including panic attacks, and auditory hallucinations.  T. 551.  She reported "untreated psychiatric problems since [] childhood," with auditory hallucinations since age 9 when she was removed from her parent's home due to neglect and abuse.

---

20 C.F.R. § 416.945(a)(3).

[6] The recitation of medical and historical facts of this case, as set out below, is based on the court's independent review of the record.  Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

T. 551.  She explained she was always "able to cover it up or ignore it" but continued to have "occasional" auditory hallucinations.  T. 551.  She reported hearing one male voice, always the same, with which she could converse.  T. 551.  She said the voice "annoy[ed] her more than anything else and distract[ed] her… similar to like a TV in the background."  T. 551.

Claimant reported the onset of panic attacks 5 or 6 years prior, occurring 2 or 3 times a week, with symptoms of "chest tightness, fear, feeling like about to faint, and shortness of breath."  T. 551.  She also reported low energy and poor concentration.  T. 551.  Dr. Howard diagnosed Psychotic Disorder NOS and Generalized Anxiety Disorder and prescribed Celexa and Haldol.  T. 552.

By October 24, 2012, Ms. Hoke's anxiety and panic attacks had improved, but she continued to have problems with her mood and auditory hallucinations.  T. 553.  The Celexa and Haldol dosages were increased.  T. 554.  When seen on November 9, 2012, Ms. Hoke had an "obvious head tremor" due to medication effects, but she wanted to continue on her current dosage as the auditory hallucinations had "decreased to background noise."  T. 555.  Ms. Hoke complained of anhedonia, over-sleeping, fatigue, decreased concentration, and abnormal involuntary movements; the doctor prescribed Cogentin.  T. 555.

On November 30, 2012, Ms. Hoke reported Cogentin helped the involuntary movements and although she continued to experience auditory hallucinations, they

were "'like a television in the other room'" and did not cause distress.  T. 560.  She reported difficulty concentrating and psychomotor retardation.  T. 560.  A month later, on December 28, 2012, Ms. Hoke complained of anxiety and increased auditory hallucinations due to the stress of the holidays; her Haldol dosage was temporarily increased.  T. 563.  As of March 1, 2013, the auditory hallucinations were "much improved[.]"  T. 567.

On March 29, 2013, Ms. Hoke started treatment with the VA.  T. 584-90. During her initial evaluation, Ms. Hoke said she began "experiencing auditory hallucinations as early as her teenage years," which occurred daily and were like "'background noise.'"  T. 584.  She "denied any command hallucinations and sa[id] the hallucinations [were] not disturbing."  T. 584.  She was "pleased" with her current medications -- Citalopram, Haldol, and Benztropine (Cogentin).  T. 584.

A couple of weeks later, Ms. Hoke reported excessive sleep and weight gain, but said she did not need additional medication to control her symptoms.  T. 578. She described continued auditory hallucinations -- like "background noise" -- and was instructed to decrease her dosage of Haldol.  T. 578.  Shortly thereafter, Ms. Hoke reported increased auditory hallucinations; she also reported excessive somnolence.  T. 574.  She was diagnosed with Schizophrenia and Psychotic Disorder NOS.  T. 576-77.  During her next visit, Ms. Hoke said she was "pleased" with her medications and the "voices [were] controlled;" however, she continued to struggle

with somnolence.  T. 670-71.  On September 13, 2013, she reported daily auditory hallucinations.  T. 639.

Approximately 10 weeks later, on December 3, 2013, plaintiff saw Linda Lancaster, M.D.  T. 686-91.  Dr. Lancaster noted Ms. Hoke was being treated by a VA nurse practitioner but had been told she needed a psychiatric evaluation to aid "in her pursuit of social security benefits for which she has been denied twice."  T. 686.  Dr. Lancaster recorded a history of auditory hallucinations since age 9, when claimant told her mother and "was told not to speak of it."  T. 686.  According to Dr. Lancaster, Ms. Hoke reported a "surge" in auditory hallucinations, along with panic and anxiety symptoms, while on active duty; she mentioned one voice in particular and said she "just hid her symptoms from superiors, coworkers and husbands."  T. 686.

Dr. Lancaster noted Ms. Hoke first sought mental health treatment in 2012 at the urging of her husband, who detected increasing difficulty with anxiety, panic attacks, apprehension about leaving the home alone, driving, and feelings of persecution at work.  T. 686.  "Additionally, she seemed to be responding to internal stimuli – AH [auditory hallucinations]."  T. 686.  Dr. Lancaster observed "very mild" psychomotor agitation and anxiety with continued auditory hallucinations of a male voice, "though muffled on meds."  T. 689.  She diagnosed Psychosis NOS with auditory hallucination and Paranoia and Anxiety Disorder NOS with panic attacks

and noted an "unusual presentation of [auditory hallucinations] with paranoia for most of life, and anxiety symptoms with panic attacks." T. 689-90. She found "marked difficulties interacting in public and workplace settings due to anxiety and paranoia." T. 690. She also documented abnormal movements as a result of medication side effects and recommended a change in medication. T. 690.

Plaintiff saw Dr. Lancaster again on July 31, 2014, at which time she reported continued auditory hallucinations and worsened anxiety. T. 694. According to Dr. Lancaster, Ms. Hoke "continue[d] to struggle with [especially auditory hallucinations], paranoia, inability to go into public, panic and anxiety attacks." T. 694. Dr. Lancaster recorded "very mild" psychomotor agitation, anxious affect and mood, delusions including paranoia that others may be watching or talking about her, and auditory hallucinations of a male voice, "more prevalent and clear of late." T. 697. Her medication was again adjusted. T. 697.

On August 14, 2013, Dr. Julian Salinas evaluated Ms. Hoke in connection with her application for disability benefits and completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) ("Medical Source Statement"). T. 594-602. Dr. Salinas reviewed the October 3, 2012, report from Dr. Howard and progress notes dated October 24, 2012, through March 1, 2013, from Life Management. T. 598. He noted prescriptions for Haloperidol, Benztropine, and Citralopram, which Ms. Hoke reported helped with anxiety but not

hallucinations.  T. 599.  Plaintiff informed Dr. Salinas she could perform self-care tasks, but "'sometimes [had] to be reminded,'" and household chores, including cooking, although she did not drive alone due to panic attacks.  T. 599.

Dr. Salinas noted a history of childhood abuse, resulting in Ms. Hoke being removed from her mother's custody at age 9.  T. 599.  Ms. Hoke reported the onset of emotional difficulties at that time, including hearing and responding to voices.  T. 600.  She purportedly experienced "such difficulties intermittently throughout her life, even during her period of military services," although the hallucinations were worse during periods of elevated life stress.  T. 600.  Ms. Hoke described the voices as "'instigating', 'eggs stuff on', and pass commentary on negative emotional states."  T. 600.  She said the voice was "male, . . . loud, and . . . unpleasant."  T. 600.  She "denied command content" but "report[ed] suspiciousness of others and a propensity to persecutory ideation."  T. 600.  Plaintiff also reported panic attacks, described as "discrete episodes of tightness in her chest, numbness in her fingertips, and difficulty breathing, with a sudden and out of the blue onset," occurring twice a week and lasting for 5 to 10 minutes."  T. 600.

Dr. Salinas noted plaintiff's "interpersonal demeanor was cooperative anxious and marked by some peculiar demeanor and use of speech (e.g. laughing with no evident context and using the word 'we' in lieu of 'I'.)."  T. 601.  He diagnosed Panic Disorder with Agoraphobia and Psychotic Disorder NOS.  T. 601.  He also

said Ms. Hoke "appear[ed] . . . incapable of managing her own funds." T. 601. In summary, he explained, "[s]he complains of ongoing difficulties consistent with psychosis, marked by auditory hallucinations with derogatory content, and suspicious ideation with a propensity to persecutory attributions. Moreover, she describes difficulties consistent with panic attacks, which are accompanied by moderate agoraphobic avoidance." T. 601-02.

Dr. Salinas indicated Ms. Hoke would have "marked" impairment in her ability to interact with the public, supervisors, and co-workers and also in her ability to respond appropriately to usual work situations and changes in a routine work setting. T. 596. He found "moderate" impairment in the ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions and "mild" impairment in the ability to understand, remember, and carry out simple instructions and make judgements on simple work-related decisions. T. 595.

In May 2013, non-examining psychologists Pauline Hightower, Psy.D., and Richard Willens, Psy.D., found Ms. Hoke' mental impairments not severe. T. 128, 137-40. In May 2013, non-examining physician Robert Steele, M.D., found the medical evidence of record "insufficient to assess" physical RFC. T. 137.

At the September 2014 hearing, the ALJ asked the vocational expert, Susanna D. Roche, to assume a hypothetical individual with the same limitations included in

the RFC.  T. 114-15, 117-18.  Plaintiff's counsel then provided a modified

hypothetical question, addressing the additional limitations Dr. Salinas imposed:

> I'd like for you to assume, in addition to what the Judge
> has already given you as far as limitations, the following
> specific limitations from Exhibit 7F, page three [R. 596].
> And those limitations are listed by Dr. Salinas as marked
> impairments in four areas, and let me read you the
> definition of marked. Marked is indicated as "there is
> serious limitation in this area, there is a substantial loss in
> the ability to effectively function."  If you assume that a
> person had marked impairments in interacting
> appropriately with the public, and interacting
> appropriately with supervisors, and interacting
> appropriately with coworkers, and responding
> appropriately to usual work situations and changes in a
> routine work setting -- if a person had four marked
> impairments as indicated under that definition of marked,
> would that –
>
> ***
>
> Okay. The fourth one is respond appropriately to usual
> work situations and to changes in a routine work setting.
> And Dr. Salinas indicates that the reason for this is
> psychosis with hallucinations and persecutory ideations,
> anxiety with behavioral thought – I can't read that – I'm
> not sure, something interference – task – behavioral task
> interference.  If a person had four marked impairments as
> indicated, would that person be able to function in any job
> in the national economy?

T. 117-18.  The vocational expert responded: "Not in my opinion, sir."  T. 118.

ANALYSIS

I.      Residual Functional Capacity

Ms. Hoke first argues the ALJ erred in failing to incorporate into the RFC all limitations Dr. Salinas imposed – specifically, Dr. Salinas' finding claimant would have "marked" impairment in the ability to interact with the public, supervisors, and co-workers and respond appropriately to usual work situations and changes in a routine work setting.   T. 596.   Medical source opinions are to be considered, as plaintiff urges, but "the final responsibility" for determining RFC is reserved to the Commissioner.   *See* 20 C.F.R. § 404.1527(e)(2); *see also* 20 C.F.R. § 404.1546(c) (at the hearing level, the ALJ is responsible for determining a claimant's RFC).   As explained in Social Security Ruling (SSR) 96-5p,

> [a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s).

SSR 96-5p, 1996 WL 374183, *4 (S.S.A.).   Hence, while medical source opinions are relevant evidence, they are not determinative because the ALJ decides RFC based on all the evidence of record.   *See* 20 C.F.R. § 404.1527(d) (some opinions, such as RFC or a claimant's ability to work, are not medical opinions, but rather

"opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case").

Here, after considering all the evidence, the ALJ determined Ms. Hoke had the RFC to perform work at all exertional levels with nonexertional limitations to account for mental impairments. T. 20. Specifically, the ALJ limited Ms. Hoke to understanding, remembering, and carrying out simple instructions as well as performing simple, repetitive tasks due to concentration and memory deficits; no more than occasional contact with co-workers; no contact or interaction with the public; and a low stress environment, defined as few changes in the work environment and limited complex judgment making. T. 20. Viewed objectively, then, the ALJ effectively accounted for the limitations Dr. Salinas imposed.

Substantial evidence also supports the RFC determination. As the ALJ noted, on October 3, 2012, one month before the alleged disability onset date, Ms. Hoke reported only "occasional" auditory hallucinations. T. 551. An examination revealed largely normal findings, including appropriate mood and affect, normal thought content, full orientation, goal-oriented thought process, appropriate intellectual functioning, normal quality/content of speech, and fair insight, judgment, and attention. T. 551-52, 606-07. A couple of months later, in December 2012, Ms. Hoke said her anxiety and auditory hallucinations were secondary to holiday stress. T. 563. She denied visual hallucinations, reported her medication

was effective, and had a normal mental status examination. T. 563-65, 618-20. VA treatment notes consistently reflect "good" findings with respect to memory, attention, concentration, judgment, abstraction, and production and continuity of thought. T. 574-75, 578-79, 588-89, 640, 654-55, 676. Ms. Hoke received Global Assessment of Functioning ("GAF") scores as high as 75 during the relevant period.[7] T. 576, 589, 637, 645, 656, 673, 677.

Dr. Lancaster's notes show Ms. Hoke was alert and oriented with normal speech, logical and goal directed thought process, intact judgment, grossly intact memory and concentration, and fair insight. T. 689. Dr. Salinas' notes indicate Ms. Hoke made appropriate eye contact, exhibited no gross problems with expressive or receptive language skills, could follow a simple sequence of directions, was fully

---

[7] The GAF rating has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within the range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 34 (4th ed., text rev., 2000). A GAF between 51 and 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning;" a GAF between 61 and 70 indicates "mild" symptoms or "some difficulty in social, occupational or school functioning," but "generally functioning pretty well;" a GAF score between 71 and 80 indicates transient and expectable reactions to psychosocial stressors and no more than a slight impairment in social, occupational, or school functioning; a GAF score between 81 and 90 indicates no or minimal symptoms and good functioning in all areas. Id. The most recent edition of the Diagnostic and Statistical Manual no longer recommends use of the GAF scale, acknowledging "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

oriented, spoke logically and coherently, and had a generally "cheerful attitude."  T. 598-602.  The record more than substantially supports the RFC determination.  T. 595-602.  *See* 20 C.F.R. § 404.1545(a)(3) (RFC is "based on all of the relevant medical and other evidence"); *see Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th 2005) (even if the record could support a different RFC, when based on substantial evidence, the ALJ's determination will not be disturbed); *see also Falge v. Apfel*, 150 F.3d 1320, 1324 (11th Cir. 1998) (in concluding substantial evidence supported the ALJ's decision, the court noted the absence of opined activity restrictions inconsistent with the ALJ's RFC determination).[8]

## II.    Dr. Lancaster's Opinion

As her second assignment of error, Ms. Hoke posits the ALJ failed to specify the weight afforded Dr. Lancaster's opinion.  On December 3, 2013, Dr. Lancaster examined Ms. Hoke for the first time and indicated, among other things, "marked difficulties interacting in public and workplace settings."  T. 690.  Notably, at the time she prepared the report, Dr. Lancaster had seen plaintiff only once and thus was not a treating source.  T. 686-91.  Unlike a treating physician, the opinions of an examining or reviewing source are not entitled to any special weight or deference.

---

[8] The ALJ gave Dr. Salinas' opinion significant weight.  He would have been required to adopt all of the limitations Dr. Salinas imposed only if he gave the opinion "controlling weight." *See* SSR 96-2p, 1996 WL 374188, *1 (S.S.A.).  The only opinions that can be accorded "controlling weight" are those from treating sources that are well supported by medically acceptable clinical and diagnostic techniques and not inconsistent with other substantial evidence in the record. *See id.*

*See* 20 C.F.R. § 404.1527(c); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (unlike treating physicians, opinions from one-time examiners are not entitled to special deference or weight). Dr. Lancaster's report also was prepared after the relevant time period. T. 686-91. *See Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir. 1999) (the issue is whether a claimant was "entitled to benefits during a specific period of time").

Nevertheless, and perhaps contrary to claimant's inference, the ALJ clearly considered Dr. Lancaster's opinion and effectively incorporated Dr. Lancaster's findings in the RFC, which limited claimant to jobs involving no more than occasional contact with co-workers and no contact or interaction with the public, thereby accounting for marked difficulties in public and workplace settings. T. 690. Any failure to formally specify the weight given Dr. Lancaster's opinion thus constitutes harmless error. *Cf. Stafford v. Colvin*, No. 8:13-CIV-3006-T-17-MAP, 2015 WL 224651, *4 (M.D. Fla. Jan. 15, 2015) (failure of ALJ to weigh or consider treating physician's statement that claimant was unable to work is not grounds for remand when ALJ discussed the physician's medical records); *Ricker v. Comm'r of Soc. Sec.*, Case No. 5:13cv479-OC-18PRL, 2014 WL 6610849, at *7-8 (M.D. Fla. Nov. 21, 2014) (finding ALJ's failure to assign weight to examining doctor's opinion to be harmless error when ALJ examined the doctor's findings and they were consistent with a treating physician's opinion that was rejected). Importantly, in the

context of judicial review of Social Security determinations, courts will disregard any errors or defects in a lower tribunal that "do not affect any party's substantial rights."  Fed. R. Civ. P. 61; *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error doctrine to a Social Security appeal).

III.    Credibility Determination

Finally, Ms. Hoke argues the ALJ erred in finding her not fully credible.  As Social Security law provides, if the Commissioner refuses to credit plaintiff's subjective testimony, she must do so explicitly and give reasons for the decision in that regard.  *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  Although the Eleventh Circuit does not require an explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  The credibility determination need not cite particular phrases or formulations, but it cannot merely be a broad rejection, which is not enough to enable the reviewing court to conclude the ALJ considered the claimant's medical condition as a whole.  *Id.*  And, of course, the reasons articulated for disregarding the plaintiff's subjective testimony must be based on substantial evidence.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002); *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley v. Barnhart*, 385 F. Supp. 2d 1245, 1259 (M.D. Fla. 2005).

"[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints"). People with objectively identical conditions can experience significantly different symptoms, and symptoms are more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed symptoms]. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." *Hand v. Heckler*, 761 F.2d 1545, 1548-49 (11th Cir. 1985). The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

To establish disability under the Act, plaintiff cannot simply allege disabling symptoms. See 20 C.F.R. § 404.1529(a) ("statements about your pain and other symptoms will not alone establish that you are disabled"). Rather, she must show both an underlying medical condition that could cause such symptoms and evidence of their alleged intensity, persistence, and limiting effect. *See* 20 C.F.R. § 405.1529(b), (c); SSR 96-7p, 1996 WL 374186, *2 (S.S.A.) (the alleged intensity,

persistence, and limiting effects of subjective symptoms must be evaluated to determine the extent to which they may affect a claimant's functioning).[9] Once a medical condition is shown that could reasonably be expected to cause subjective symptoms, the ALJ evaluates the alleged intensity and persistence based on all record evidence. *See* 20 C.F.R. § 404.1529(c)(4); *Wilson*, 284 F.3d at 1226 (ALJ may properly reject claim of disabling pain by providing a rationale based on evidence to the contrary of such claim).

The ALJ found Ms. Hoke had severe impairments that could reasonably be expected to cause her alleged symptoms but that her claims of disabling intensity, persistence, and limiting effect were not credible to the extent they conflicted with the RFC. T. 20-21. Substantial evidence supports the ALJ's decision in that regard. The record shows mental status examinations with fairly benign, unremarkable findings. T. 551-52, 574-75, 578-79, 588-89, 606-07, 640, 654-55, 676. Moreover, plaintiff's statements concerning her symptoms are inconsistent. For instance, in her disability report, Ms. Hoke indicated she began experiencing mental health symptoms in 2009; she did not seek mental health treatment, however, until October 2012. T. 362, 551. At that time, she reported she had been hearing voices since age

_____

[9] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p. *See* SSR 16-3p, 2016 WL 1237954, *1 (S.S.A.). The ALJ issued his decision before the effective date of SSR 16-3p; accordingly, the ALJ followed SSR 96-7p, the policy statement in effect at the time of his decision. The two SSRs set forth substantially similar processes for evaluating a claimant's reported subjective symptoms.

9; the following year, she reported she began hearing voices as a teenager. T. 551, 584. In March 2013, Ms. Hoke said she was hospitalized in 2010 for psychiatric symptoms; in October 2012, she denied any previous psychiatric history or treatment. T. 551, 584.

Ms. Hoke's reports regarding auditory hallucinations also are inconsistent. In August 2013, she reported hearing a loud and unpleasant male voice that was instigating in nature. T. 600. She previously had consistently described the hallucinations as background noise or like a television in another room with no command hallucinations. T. 560, 567, 578, 584, 639, 675. In fact, Ms. Hoke had indicated the hallucinations were not disturbing. T. 551, 584, 639. She also said they were controlled by medication, which reduced them to "background noise." T. 555. Moreover, Ms. Hoke's husband said she watched television and played games daily and went fishing once every one to two weeks, all of which require concentration and focus that would be difficult to maintain in the midst of disturbing auditory hallucinations. T. 331, 334. *See* 20 C.F.R. § 404.1529(c)(3)(i) (stating ALJ properly considers a claimant's reported daily activities during the relevant period); *see also Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (finding ALJ properly discredited subjective pain complaints based in part on claimant's reported activities during the relevant period). Finally, the record contains no inpatient treatment or psychiatric hospitalizations, suggesting impairments not as severe as alleged. *See*

20 C.F.R. § 404.1529(c)(3)(v) (providing ALJ properly considers treatment received).

To the extent plaintiff argues the credibility finding was erroneously based on GAF scores, she is incorrect. The ALJ discussed GAF scores when recounting Ms. Hoke's medical history, but there is no indication he relied on the scores for any purpose, including making a credibility determination. T. 21, 25-26. In fact, the ALJ did not mention GAF scores in the paragraph of his decision addressing credibility. Instead, he referenced substantial evidence that casts doubt on the veracity of plaintiff's claims regarding the severity of her symptoms, including inconsistent statements that occurred only after Ms. Hoke applied for benefits. T. 20-26. The ALJ's credibility determination thus is based on substantial evidence in the record. *See Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986) ("The weighing of evidence is a function of the factfinder [ALJ], not of the district court."); *see also Dyer*, 395 F.3d at 1212 (finding reversible error where court rejects an ALJ's adequately explained credibility determination).

## CONCLUSION

In sum, although the evidence shows Ms. Hoke suffered from mental impairments, there is no evidence the impairments precluded her from working with the restrictions the ALJ imposed. The ALJ's decision, therefore, is supported by

substantial evidence in the record and application of the correct legal standards; it thus should be affirmed.[10]

Accordingly, it is respectfully RECOMMENDED:

1.  That the decision of the Commissioner be AFFIRMED and plaintiff's application for Disability Insurance Benefits DENIED.

2.  That the clerk be directed to close the file.

At Pensacola, Florida this 26th day of July, 2017.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being a served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon the Magistrate Judge and all other parties.  A party failing to object a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* U.S. Ct. of App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.

---

[10] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review.  *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).